**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**UNIOIL, Defendant,**

**and**

**William M. Mulderig, Defendant–Appellant.**

**No. 91–5044.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 18, 1991.

Decided Dec. 27, 1991.

Rehearing Denied Feb. 14, 1992.

William M. Mulderig, pro se.

Lucinda O. McConathy, Asst. Gen. Counsel, S.E.C., with whom James R. Doty, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Michael G. Lenett, Sr. Counsel, and Paul Gonson, Sol., Washington, D.C., were on brief, for appellee.

Before EDWARDS, RUTH B. GINSBURG, and SENTELLE, Circuit Judges.

PER CURIAM Judgment.

Separate Concurring Opinion filed by Circuit Judge EDWARDS.

### JUDGMENT

PER CURIAM.

Our review in this appeal rests on the record from the United States District Court for the District of Columbia, the briefs filed by the parties, and oral argument by the Securities and Exchange Commission. Appellant Mulderig, an attorney proceeding pro se, did not appear at oral argument.

Disgorgement is an equitable remedy available to redress the violation of securities laws. *See SEC v. First City Financial Corp.,* 890 F.2d 1215, 1230 (D.C.Cir.1989). Given appellant's default

on Count One, charging violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, the district court's disgorgement order was appropriate.

■ Nor was the amount ordered disgorged plain error. In view of the company's insolvency, the Commission assumed, not without cause, that the fraudulent Soberz campaign was responsible for the entire value of the corporation reflected in the December 1986 stock price. Most critically, appellant offered no calculation of his own for the district court to consider, but simply insisted that he gained nothing from the fraud. The Commission suggested that a loan Mulderig received against a pledge of the stock might have been an appropriate basis for the disgorgement calculation; but Mulderig, on the Commission's inquiry, could not recall the amount of that loan. It is accordingly

ORDERED AND ADJUDGED that the judgment from which this appeal has been taken be affirmed.

The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. *See* D.C.Cir.Rule 15.

HARRY T. EDWARDS, Circuit Judge, concurring:

I agree with the panel's judgment that no plain error occurred in this case. I write separately because the SEC's disgorgement calculation troubles me and I can find no explanation in the record below. In two significant ways, the Commission seems to have deviated from accepted practice in calculating the disgorgement amount.

In September 1985, the bankruptcy court for the District of Colorado approved a chapter 11 reorganization plan for defendant below UNIOIL Corporation. UNIOIL's primary business was the acquisition and development of oil and gas leases. Pursuant to the plan, appellant William Mulderig, through Joseph Associates, a corporation controlled by him, loaned approximately $6,000,000 to UNIOIL. In addition to an extremely high interest rate (the greater of 19% or 6% over prime), Joseph Associates received security interests in almost all of UNIOIL's assets and an option to purchase 3,000,000 shares of UNIOIL's common stock. UNIOIL's stock had been listed on the Boston Stock Exchange and quoted on NASDAQ. The option could be exercised for $0.25/share during the first year after the loan closing and for $1.50/share for 18 months after the initial year. *See* UNIOIL Corp., Form 10–K, Annual Report for Fiscal Year Ended December 31, 1989, at 2–4 (filed with Defendant's Response to Plaintiff's Motion for Civil Contempt, District Court Docket Item 33) ("Annual Report"). At the time Mulderig became involved, UNIOIL had several operating wells and some acquired but undeveloped land; but UNIOIL has not drilled any new wells since the plan approval.

In June 1986, Mulderig acquired for UNIOIL the rights to a drug known as "Soberz" which was claimed to make a drunk person sober. The inventor of the pill told Mulderig that the sole ingredient in Soberz was activated charcoal, and neither the inventor nor UNIOIL ever submitted Soberz to the FDA for approval. Mulderig then commenced a publicity campaign touting the effectiveness of Soberz and consisting of, "among other things, the issuance of press releases, the conducting of demonstration meetings for stockbrokers and the preparation and inclusion of discussions of the sober pill in at least one report filed with the Commission." SEC Complaint ¶ 14, *reprinted in* SEC Appendix ("SEC App.") 12. In December 1986, after the sober pill campaign, Mulderig exercised the option and purchased all three million shares.

The SEC brought suit against Mulderig and UNIOIL based on the Soberz campaign and extended non-filing of certain SEC reports. The non-filing counts are not relevant to this appeal. Mulderig and UNIOIL defaulted as to liability. Thereafter, the SEC moved for disgorgement from Mulderig, based on the exercise of his option. Mulderig, proceeding pro se, opposed the

motion, but the District Court approved the disgorgement request.

I concur with the per curiam that the disgorgement order falls well within the District Court's power to remedy a Rule 10b–5 violation, such as the fraudulent Soberz campaign. I also have no argument with a refusal to apply a block discount. Nonetheless, the SEC's disgorgement calculation seems odd, and presents problems that should have been raised by the SEC itself before the District Court and resolved on the record.

The touchstone of a disgorgement calculation is identifying a causal link between the illegal activity and the profit sought to be disgorged.

> Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing. The remedy may well be a key to the SEC's efforts to deter others from violating the securities laws, but disgorgement may not be used punitively. Therefore, the SEC generally must distinguish between legally and illegally obtained profits.

*SEC v. First City Financial Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989) (citations omitted); *see also id.* (collecting cases); *Wellman v. Dickinson*, 682 F.2d 355, 368 (2d Cir.1982) ("the loss complained of must proceed *directly* and proximately from the violation claimed and not be attributable to some supervening cause") (citation omitted), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978) ("Disgorgement is remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment.").

In many cases of course, determining the amount illegally gained will be difficult. "Accordingly, disgorgement need only be a reasonable approximation of profits causally connected to the violation." *First City Financial*, 890 F.2d at 1231. Additionally, the SEC, while always bearing the burden

of persuasion, need only offer a prima facie reasonable approximation. The burden then shifts to the defendant to rebut that presumption. *Id.* at 1232.

The SEC's disgorgement calculation in this case is deceptively simple. The agency calculated the difference of the market price for UNIOIL on the day Mulderig exercised his option ($1%₁₆) and the option price ($ 0.25) and multiplied by the number of shares Mulderig acquired (3,000,000). The SEC then discounted the total by one-third because the stock was restricted and could be sold only pursuant to a new registration statement or under the "dribble out" provisions of Rule 144, 17 CFR § 230.-144. *See* SEC's Motion for Disgorgement, SEC App. 80. The calculation, therefore, works to deprive Mulderig of all of the profit made when he exercised the option.

Despite its surface appeal, the SEC's measure here seems to me flawed in two important regards. First, the calculation does not attempt to divide licit from illicit profits. Mulderig *legitimately* acquired the option to purchase the 3,000,000 shares, and the SEC does not contend otherwise. Therefore, he should disgorge only the amount his profit increased due to the Soberz campaign. In other words, the appropriate disgorgement amount is not the difference between the market price and the option price, but rather the difference between the market price and what the market price *would have been but for* the Soberz campaign.

A similar situation was presented in *SEC v. MacDonald*, 699 F.2d 47 (1st Cir.1983) (en banc). The defendant there had purchased stock without disclosing material inside information and then held the stock for some time after the information became public. The stock appreciated both on the disclosure of the information and during the period the defendant continued to hold the stock. The SEC sought to disgorge the complete amount represented by the difference between the purchase price and the eventual sale price. The *MacDonald* court held that this reached too much to the legitimate profit, and required the SEC to estimate the amount of appreciation due to

the inside information withheld. *Id.* at 52, 54.

> When a fraudulent buyer has reached the point of his full gain from the fraud, viz., the market price a reasonable time after the undisclosed information has become public, any consequence of a subsequent decision, be it to sell or to retain the stock, is res inter alios, not causally related to the fraud.

*Id.* at 54.

The flip side of *MacDonald* is illustrated by *SEC v. Shapiro*, 494 F.2d 1301 (2d Cir.1974). There, the defendant sought a reduction in the amount to be disgorged because the stock price subsequently fell. The court refused, holding that any move in the stock price after disclosure was at the risk of the defendant.

> A violator of the securities laws should disgorge profits earned by trading on non-public information. Once public disclosure is made and all investors are trading on an equal footing, the violator should take the risks of the market himself.

494 F.2d at 1309.

These cases combine to form the general principle that the party seeking disgorgement is entitled to recover the amount the fraud, but only the fraud, changed the market. Moves in the stock price due to the inherent value of the corporation, or lack thereof, inure to the benefit or risk of the defendant.

The SEC made no attempt here to compare the market for UNIOIL stock before the Soberz campaign to the market after, or to the market after the fraudulent nature of the Soberz pill was discovered.[1] The SEC claimed on oral argument here that the market never absorbed the fact that Soberz did not work. Even if that is true, and I can find no record evidence either way, it means only that the illicit portion of the stock's value had not been purged, not that the stock in 1986 was otherwise completely worthless.

Indeed, Mulderig did assert below that the SEC failed to show any profit from the Soberz campaign. "Even assuming the allegation of the promotion of 'Soberz' there was no profit made by Mulderig...." Defendant's Memorandum of Points and Authorities (Opposing Disgorgement), at 2 (District Court Docket Item 26). "[SEC] alleged that a promotion of Soberz was conducted.... The highest bid in that year was in August of 198[6] for 4⅝ths for UNIOIL stock." Defendant's Statement of Material Facts (Opposing Disgorgement), ¶ 5, SEC App. 85. "On December 12th, 1986, when Mulderig exercised his Court approved option, ... [t]he price of the stock was 1³/₁₆ths.... So at the time in December of 1986 when Mulderig exercised his option the stock was much less than when Mulderig took over the company ... and certainly less than in August of 198[6], the time the [SEC] has alleged improper procedure ... in promoting the Soberz pill." *Id.* ¶ 6, SEC App. 85–86. Of course, a general continuous decrease in the stock price does not prevent disgorgement. *Cf., e.g., Mac-Donald*, 699 F.2d at 52; *Shapiro*, 494 F.2d at 1309. But, the amount will turn on the counterfactual question: "How much lower would the stock have been in the absence of the fraudulent campaign?" The SEC's efforts in this case do not even confront this question.

At oral argument, the SEC suggested that its calculation could be justified either by assuming that the 3,000,000 shares be valued by reference to a loan Mulderig received, pledging the stock as collateral, or by assuming that UNIOIL was otherwise worthless. Nothing in the record, however, shows the amount loaned to Mulderig.[2] Furthermore, although the SEC asked Mulderig about the loan and he

---

1. The market price figures were available. In fact, Mulderig filed with the District Court a summary of the monthly highs and lows for 1986. Defendant's Memorandum of Points and Authorities (Opposing Disgorgement), appendix A (District Court Docket Item 26).

2. SEC's citations to the Annual Report filed by UNIOIL discuss only Mulderig's loan to UNIOIL, not the loan in which Mulderig pledged the stock. As consideration for the loan to UNIOIL, Mulderig received a high interest rate (the greater of 19% or 6% over prime), *see* Annual Report, UNIOIL's Financial Statements, at 13, as well as the stock option.

claimed to have forgotten the amount, the loan cannot be a correct measure of disgorgement *unless* the total value of UNIOIL's stock was due to the Soberz campaign. It is far from clear from the subsequently filed financials that UNIOIL was worthless at the time of the fraudulent Soberz campaign. *See* Annual Report at 20 (showing a net assets less liabilities of $1,676,466 at December 30, 1985, and a net of $(1,746,677) at December 30, 1986). The new management which filed the annual report in 1990, while conceding that UNIOIL was not then a viable going concern, nevertheless continued to seek to reduce its liabilities and believed it might operate again. *Id.* at 20–22. The company owned over $8,000,000 in total assets, *id.* at 20, and over $5,000,000 in oil and gas assets in 1986, *id.* at 10; *id.,* Financial Statements, at 8. In 1990, the company still owned over $5,000,000 in total assets, *id.* at 20, and over $3,000,000 worth of proven oil and gas assets, *id.* at 10.

The second problem with the SEC's disgorgement calculation is its failure to account for dilution of the capital structure due to Mulderig's exercise of his option. Before the exercise, UNIOIL had outstanding 5,791,241 shares of common stock. Because he purchased more than half the number of shares then outstanding at less than one-fifth the price, Mulderig's option would have diluted the stock's worth substantially. *See* RICHARD BREALEY & STEWART MYERS, PRINCIPLES OF CORPORATE FINANCE 524–36 (2d ed. 1984). The Commission's calculation, using only the trading price just before the option was exercised, does not take this factor into account. Neither do the alternative explanations offered at oral argument and discussed above reach this problem.[3]

I am aware of the difficulties the SEC faced in this case with gathering documents and information from UNIOIL and Mr. Mulderig. And I agree that the value disgorged can be reached by combining several of the assumptions the SEC proffers. Nevertheless, the SEC below neither

followed the accepted calculations nor offered the accepted formulae to the District Judge along with a justification for deviating from them. The courts must be able to rely upon government counsel to portray accurately the governing principles, especially with respect to highly technical matters arising in the enforcement of legal principles. When those principles arguably do not apply, the Government should highlight the problems to the court and attempt to explain and justify appropriate alternative approaches.

Nonetheless, because Mulderig did not raise these concerns on appeal, and because the Commission's calculation is not plain error, I concur.

---

**3.** At oral argument, the SEC suggested that a control premium might offset any dilution. But, again, that reasoning was neither presented to the trial judge nor supported by record evidence.